Good morning, and may he please the court. My name is Howard Hong on behalf of the petitioner, Mr. Chiu Chin-Fong Do-Feng. When I was first contacted by the petitioner's son, who is present in the hearing room today, I said to the son, your father's case is not going to be a simple adjustment of status case because of the involvement by Chinese government agents. What I did not expect was that our executive branch of government would comport itself in a manner more befitting that of a totalitarian regime. First, the USCIS denied Mr. Fang's adjustment of status based upon a bogus interpol report by the Chinese communist agents. The communist agents reported that Mr. Fang had been convicted of a crime. That was not true as the immigration judge found out once removal proceedings commenced early on in the case. The decision denying adjustment by the CIS was contrary to established procedures and regulations. As part of an adjustment of status application, certain forms are submitted and one of those forms, the biographical data form, is sent routinely to the American embassies and consulates abroad for our government to obtain any information that might be out there relating to a particular applicant for adjustment of status. The record doesn't show that that had been done. If it had been done, there's nothing adverse. It is one to believe that there was nothing in the judicial system of the Chinese government that said Mr. Fang had been convicted of the crime reported by the agents to interpol, which led to his denial of adjustment of status and subsequent detention during the whole immigration court removal proceedings. Further, the immigration judge, in the name of protecting the confidentiality of Mr. Fang's request for protection under the Convention Against Torture, bifurcated the renewal of Mr. Fang's adjustment of status application from his CAT application, which is ordinarily a good thing. We certainly don't want the communist agents testifying to be aware of the other part of the case, if they're testifying just on whether or not there's a conviction that exists. But then, strange things began to happen. After taking testimony from the two communist agents and the alleged co-conspirator, who was promised a reduced sentence if he behaved in a good manner, the immigration judge found that... No, no, no. He had... Not so. Mr. Guo had his sentence reduced before he testified. That's correct. We don't know exactly when that reduction might have been. Well, it was... The reduction took place before 2000, wasn't it? Yes, Your Honor. The immigration judge, after taking testimony, found that the petitioner may have been involved in criminal activity and thus denied the petitioner's adjustment of status in the exercise of her discretion. If this were the end of the matter, that would be well and good, and we would not be here challenging the exercise of discretion. But what happened three months after the immigration judge denied the adjustment of status, the immigration judge took testimony on the Kat claim, took testimony from the petitioner's expert witness on the Chinese communist judicial system or police system, and also took into account the State Department's country reports, and the immigration judge came to the conclusion that those two communist police agents were not trustworthy and should not be believed, and therefore did believe that Mr. Fang would be subject to torture if he were returned to China and subjected to criminal prosecution. The IJA found that the people who testified in the immigration... in the asylum hearing... The... In the adjustment of the hearing. Correct. The adjustment portion is heard by the same immigration judge. Inspector Han was one of them. That's correct, Your Honor. And she made a finding that they were not credible in the Kat... Yes, she said they were not trustworthy because... Where was... Can you give me the citation? Read it to us if you've got it. Well, I don't have that, but if I could refer to, Your Honor, to the administrative record at 237 and also 974 and also back to 235, Your Honors. That's where the immigration judge discusses the testimony of the... Well, it's a big deal that you don't have the transcript. Well, my assistant, I think, will get that for me, Your Honor. Well, I'm looking at 237, which is part of the IJA's decision. And I really don't read that to say that the IJA found the Chinese police officials incredible. The skepticism has to do with the insistence that if he returns to China, they will be fair and procedurally unbiased toward defendants. It goes on to say, The State Department reports report to the rapporteur and Dr. Rosen corroboratively show otherwise. So it's the same thing as to say that, Look, he's not going to get treated fairly because the Chinese criminal system doesn't work the way that we think it ought to or we think is fair. But that doesn't say that we think these guys have been lying through their teeth and can't be believed. Well, two places. Number one, as I said earlier, the Interpol report was not truthful, which was put in by the Chinese agent. Secondly, the first agent testified or one of the agents testified that Mr. Fang was guilty and that he made the determination of guilt and that all the judge would have to do was to impose sentence. I suspect most policemen in the United States, after arresting and charging somebody, would testify that, yeah, I got the guy that was guilty. Well, that may be true, but they should not. And neither of those things represents a finding by the IJA that those witnesses are not credible, which is the statement of yours that I'm focusing on. They're not to be believed because they've made so many inconsistent statements. And they said that someplace. And I'm still looking to see where the IJA said that. That may be your conclusion. But, Mr. Hong, you told us a moment ago that it wasn't your conclusion. You represent that that was a statement by the immigration judge. Now, we've been through 237. The other two citations you gave us was 235 and 974. I have in my notes, Your Honor. All right. Go on to something else. Also, Your Honor, for 237 in the bottom half, all the officers Chen, Han and Song Wei have made descriptions of the criminal justice system in China in which they claim to be fair and procedurally unbiased towards defendants. The State Department reports. Well, that's what I just read to you. And I'm still looking in that paragraph for anything that represents a finding by the IJA that they're not credible. Let me fast forward to the BIA decision. The BIA decision specifically states that the Board of Immigration Appeals decision depended to the petitioner's opening brief. The August 32,007 decision. That's page two. It starts on page two. All right. The BIA decision of August 32,007 at page two and three. Your Honor, I'm sorry. I'm looking at the copy appended to the petitioner's opening brief. That's not at page five. All right. Page five at the administrative record. Page four of the BIA decision on the very bottom. That's the August 30,007 decision. That's page five. Page four of the administrative record. Page five. Page four of the BIA's decision. On the very bottom, the BIA points out the testimony. Very bottom of what? I'm sorry, Your Honor. Very bottom of what? Up page. Administrative record page five, page four of the BIA decision. The testimony of Guo Zhang. The response alleged co-conspirator, which was taken in the presence of Chinese prison officials who were detaining Guo as more suspect. Yes, but that's Guo. Now, take a look above that. First, in the paragraph above that. First, the Chinese officials who testified. That's the one you were saying were later found to be not credible. The Chinese officials who testified in the respondent's case did not have the same incentives to provide false information as the officials in Lin. Skipping a couple of sentences. In the present case, however, the U.S. was inquiring about a criminal investigation. Criminal investigations are legitimate government activities. Accordingly, the Chinese officials had much less incentive to give false information, particularly as to the actual criminal prosecution of the respondent had not yet occurred. Now, that is certainly not a finding by the BIA that the Chinese officials who testified were lying. Just the opposite. With all due respect, Your Honor, the immigration judge did find that in the cap portion of the hearing that the Chinese officials would do anything to have the petitioner sent back to China subjected to the same tortures. And he granted his cap. Correct. So, yes, they can be horrible people who can torture the man, but that doesn't necessarily mean that when they testified he found them to be incredible. All right. The agents testified that Mr. Feng would be given a fair hearing with a judge, but that wasn't the case. The judge found just the opposite. All right. And that's why he didn't cap. Correct. All right. I think we've exhausted this subject. Well, Your Honor, if I may reserve the balance of my one minute left. Sure. You had a minus, minus number on your account. Mine was a minus. I'm sorry. No, no. It's right here. I'm just looking at my watch. Oh, OK. That's OK. We'll get it. A lot of deficit spending going on here. In this era, minus accounts aren't too important. May I please record? My name is Emily Radford, and I'm here today on behalf of the Attorney General, and the record is very lengthy. I brought it with me on disk. I hope my memory tells me the page numbers that you might be looking for. I apologize for not bringing it with me. This case involves a Chinese businessman who freely traveled between the United States and China for a number of years, who was placed in removal proceedings when he became involved in where charges were lodged against him indicating that he had been involved in criminal activity in China. While the proceedings below were lengthy and more complicated and involved any number of witnesses, the issue before the court today is straightforward. The first petition for review in case number 0770306 should be dismissed. There is no case for controversy or no issue for the court to decide. The Attorney General granted Mr. That's the cat decision, right? Pardon? The number used is real law. That's the cat decision, which would favor the petition. That's the first petition for review. The board granted Mr. Fang protection under the Convention Against Torture. That's not being disputed today. The Department of Homeland Security did not certify the decision to the Attorney General for review. And Mr. Fang himself did not appeal or cross-appeal the immigration judge's decision, so the court, in fact, wouldn't have jurisdiction to review that first order. What the board did do was grant Mr. Fang's motion for reconsideration and address the arguments that he made in which he challenged the immigration judge's decision, denying his application for adjustment of status and the exercise of discretion. That is not an issue that this court has jurisdiction to review, as it has held in numerous cases under Section 1252A2B2, two little I's. The court does have jurisdiction after Real ID. It's very clear to review a colorable due process claim or a legal question. Why is it a colorable due process claim for the petitioner to claim that Guo's testimony whilst in jail and with his warders present was coerced? Was that a due process violation? That issue was raised, and I'm trying to answer your question as directly as I possibly can. As far as Mr. Fang was concerned, he had an opportunity to hear the evidence that the government proffered in opposition to his application for adjustment of status. He had the opportunity to address and to question, cross-examine the government's witnesses, and he was given every opportunity to present sufficient evidence on his own. So I would say, no, it was not a due process violation. The board did find that in the weighing of the evidence that Mr. Guo's testimony was that there had been sufficient evidence raised in the context of the hearing that there may be some question about his testimony, or that it should be given less weight because he would have been inclined, possibly inclined to testify in a manner that pleased the Chinese prison officials. Was there sufficient evidence of Mr. Fang's involvement in the embezzlement or claimed embezzlement from China without Mr. Guo's testimony? The board found, even setting aside Mr. Guo's testimony because of the possible doubts about it, that the immigration judge did rely on other documents in the record. In the record, there are two elements to this fraud. One is the taking of the money, but the other element is knowledge, actual or reputed, that the money was the government's money, it wasn't Mr. Guo's money. Mr. Fang could take the position, yes, I borrowed money from Guo, and yes, I invested in this country, and yes, some businesses went well, and others didn't go so well, but I had no idea that Guo was stealing it from the government. Now, what evidence other than Mr. Guo, who was serving a now reduced 20-year term and was testifying from jail with his warders present, was there that Fang knew that Guo's money came from the government, not from Guo's pocket? The immigration judge raised that issue at the January 25, 2006, Master Calendar hearing and told both the government and Mr. Fang that she was having difficulty making those findings. In response, the Department of Homeland Security identified specific evidence in the record that it believes was sufficient to support its opposition to the granting adjustment of status in the exercise of the statute. Let's talk about the facts. What evidence was there that Fang knew it was government money that was coming to him, other than Guo? There were bank records, there were land transactions, there was other documentary evidence and testimony of other witnesses that the immigration judge considered in making her fact findings. What other witnesses? The Chinese policemen? No, the depositions that were in the course of the investigation, where she discusses in her decision, I believe, what other individuals... Give me the name of one witness who testified Fang knew the money was government money. At the immigration hearing? Yes. That testified at the immigration hearing? Mr. Fang said he didn't know, Mr. Guo said he did. It was the immigration judge's decision to... Let me rephrase my question. Okay. Eliminate Fang. Eliminate Guo from my question. Give me the name of one witness who testified that Fang knew it was government money. Because if Mr. Guo was not to be believed or have his testimony severely questioned because he was in jail at the time he was testifying, I would like to know what other testimony there is that Fang knew was government money, and it wasn't Guo... Fang is not accused of defrauding Guo. There was another witness, and, Your Honor, I don't recall the name, and I would be happy to submit that. There was another person who was deposed by the Chinese government who was involved in the land transactions that I believe identified Mr. Guo and Mr. Fang as having been involved in this transaction together. I'll try to help you. Is that person identified by name in the IJ's decision? I believe that it is, Your Honor. All right. Her decision starts at 198 of the record, and she discusses the evidence in some detail. She also discusses Mr. Fang's evidence. Mr. Fang was given the opportunity to proffer evidence of his own, and while perhaps much of what she was looking at or was confronted with was circumstantial evidence, he was given a chance to provide his own evidence to refute that. He submitted affidavits from four individuals, none of whom she found that they were not sufficient because they didn't establish how they could conclusively say that there was no transaction or no wrongful transaction between Mr. Fang and Mr. Guo. None of those witnesses were called to testify on behalf of Mr. Fang. One of them, indeed, his brother-in-law, provided depositions to both the government of China and an immigration court. Mr. Fang himself agreed with the immigration judge at the January 25th hearing that he could testify to the conditions under which his evidence was given to the Chinese, and when he indicated that the son had been given money to bring to the United States. He was neither called, and there was no explanation for his absence, no request for continuance. This is not an unsophisticated businessman. His record establishes that he and his family had operated numerous businesses, that they conducted business internationally, shipping raw materials and goods. They had tax advisors. The fact that all he came to court with was his bare denials that he was involved or that he knew that Mr. Guo was involved when he could have produced, presumably produced evidence showing that the transactions that are referenced in, some of them in his own affidavits, that those were legitimate transactions that occurred through conventional means and bank transfers and so on. One of his affidavits, for example, acknowledges that he received large sums of money from Mr. Guo for a referral fee in debt. You read Mr. Guo's testimony and Mr. Fang's testimony. One says, I loaned him money, he didn't pay me back. The other says, no, I loaned him money and he didn't pay me back. It's clear from the record that there was a lot of involvement between the two of them. It was the immigration judge's job as the adjudicator to- Counselor, I'm not getting across to you. Mr. Guo and Mr. Fang are considered to be co-conspirators by the Chinese government. Correct. It's obvious, it's an old rule, a co-conspirator's statement has to be corroborated by something other than the co-conspirator's statement, especially when the co-conspirator is sitting in a Chinese jail and has a warder listening to what he's testifying to. I'm asking you, what corroboration is there in the record that Mr. Fang knew that the money was coming not from Guo, but from state sources which Guo was stealing or embezzling? And you've given me, you said there's a deposition of a person cited in the IJ opinion. I haven't been able to find a deposition even mentioned. So please help me out. I'm looking, Your Honor, as fast as I can. Look at page 24 of the IJ's decision. There's a list of names. At one time I had those people identified, and I can't tell you. Yes, and their names, the spelling changes, the pronunciation changes in the evidence in the declaration. She speaks of the affidavit of Mr. Zhang Jian on page 22 of her decision affirming his familiarity with the land deal. Page 22. Yes, he declared. I think. This is Mr. Zhang. He's the defendant. He's the respondent. No, middle of the page, affidavit of Mr. Oh, I see. He's familiar with the land deal between the respondent and Mr. Zhang. And he actually signed for the loan. Even conceding at this point, Your Honor. Mr. Zhang testified that he did this while he worked at the People's Bank of China. But where is there any testimony that the money came from government funds, Chinese government funds? The testimony that the money came from Chinese funds is Mr. Gao, whose testimony we're not giving full weight to, and from the other records that the Chinese government investigation included. Which other records? The records of the land transactions, the bank records showing remittances, the other witnesses that they deposed in exhibits, what the immigration judge referred to as exhibits 12A, B, and C. Exhibits? The three exhibits that were provided in the 12A, 12B, and 12C. 12A, 12B, and 12C. All right, thank you very much. Even if that evidence is circumstantial, it was sufficient or it was not improperly considered by the immigration judge or by the Board of Immigration Appeals in evaluating Mr. Zhang's eligibility for adjustment of status. That requires the board to make a determination that it is in the interest of the United States to admit this individual as a lawful permanent resident. That fact-finding, that weighing of the evidence was conducted by the immigration judge and on appeal by the board. Is it your position, and you can answer this yes or no, I think, is it your position that even if there is no evidence from which a rational person could conclude that Zhang knew the money came from government sources, the Attorney General has the discretion to deny adjustment of status in the interest of the United States? I am not making that argument. I think that there was evidence in this record. No, there was evidence in this record for the government to conclude. At first you were going to tell me that there was a witness who gave a deposition that Zhang knew that this money came. You've given me the affidavit that's not a deposition of Zeng Zijian. All right. That doesn't answer my question. Then you've given me Exhibits 12A through 12B and 12C, which I will read. Is there anything else that you can point to as corroborating evidence of the co-conspirator Guo, whose testimony has been devalued by the BIA? There was the sufficiency also of Mr. Fang's own affidavits that he submitted into evidence. Fang said he knew that this money came from… No, Mr. Fang submitted affidavits from his own evidence and effort to respond to the government's evidence. The immigration judge found that, and she was not compelled to believe that he was innocent simply because he said so under this court's precedent. He submitted evidence that she examined and that she found that was insufficient to compel her to find that there was no involvement on his part at all. The records are lengthy and complex, and they establish that there was a great deal of financial and business and other transactions. There's no question there were great many transactions, but there is an intent element, which is that he knew the money was from the Chinese government and was embezzled by Guo. You have to show that. Now, you're not telling me that Fang's affidavits show that. No, I am not saying that. I think we've got the idea. Okay, I am saying that your question was if no reasonable person could find that there was involvement, that the Attorney General was still free to deny adjustment of status and the exercise of discretion. You reject that suggestion. That's not the case here. Okay. That's not the case here. I think your legal proposition is to answer that question, yes. You're saying the factual assumption you're not trying to assert. But, in fact, the exercise of discretion, as I read your brief, is one that the Attorney General is free to exercise as he sees fit, and we don't have jurisdiction to review it. And I would not argue with that legal conclusion at all, Your Honor, but I would also not want to leave this Court suggesting that the immigration judge is going to make, or excuse me, the Attorney General is going to make an arbitrary or capricious decision that is not supported by the record. There was sufficient evidence in this record to support the exercise of discretion, and the fact-finding and the weighing of that evidence, whether there was sufficient circumstantial evidence, if you will, to support the denial of adjustment of status, that is a decision that was committed to the... Well, but we don't know what that circumstantial evidence is. The evidence that is in the record that the government relied on. There's no... Did you diagram this? Pardon? Did you diagram this? Did I like... No. No, I didn't. I read the record several times. I hope that I have not misstated the record. If I have, I apologize profusely. All that we really have that's concrete is that you've got the uncorroborated testimony of an informant, a co-conspirator. That's all we got. Now, you know, it may be under state law that you need some corroboration. Under federal law, I don't think you need corroboration. You also have, Your Honor, the police investigation that was conducted, the bank records, the land transactions, the depositions, and you have the police officer's testimony saying that we have lodged these charges based on this evidence that we've gathered. And those exhibits, 12A, 12B, and 12C, seem to include the documents that support the charges that were lodged. The issue in this case is, is this a person where we are confident that the record is such that we should grant him adjustment of status? And the determination was that there was at least still enough question that, and enough evidence to weigh against the favorable exercise of discretion. So in the bottom line, it's the Attorney General's discretion. And there has been no, the arguments that Mr. Fang raised before the board and in his petition for review, he's not shown a due process claim. He was, again, he was informed of the evidence that was against him. He was given an opportunity to cross-examine the government's witnesses, and he was given an opportunity to come forward with his own evidence to refute the government's reliance on the evidence. Now, counsel, in another area, in habeas, if there is absolutely no evidence that bottoms a conviction of a crime, and the petitioner in federal habeas can show that under Jackson v. Virginia, then that's a due process claim. But is there no evidence in this record? Well, that's what I've been asking you over and over again, and you've given me several different answers, but now you've given me 12A, 12B, and 12C to look at, and I will. But the issue is not whether there were transactions. The issue is whether Fang knew the money came from the People's Bank of China or other official government Chinese sources. That's what I'll be looking for. Thank you very much. Okay. Thank you, Your Honor. All right. If I were to refer to Petitioner's opening brief on page 15 and 16, referencing the administrative record at page 563, the immigration judge states, the crux of DHS's case in this court's opinion is that you now have a co-defendant, referring to Mr. Guo, who is not subject to cross-examination. And the judge goes on to state, and he has made claims that the respondent, referring to the petitioner, knew it was public funds, and he knew they were public funds, or he can make the witness available. I mean, I don't know. The judge at that point, based on the representations that he then said, is not there. You're not going to win with what you have. I've gone on to Petitioner's opening brief, page 16, referencing the administrative record, page 566. This is the judge. For this to be part of the record as it stands now, and the judge goes on, right now I have nothing in this record other than this individual, referring to Mr. Guo, the illegitimate conspirator, to prove that Mr. Fang knew they were public funds. That's when the immigration judge said, without Mr. Guo's testimony, the alleged co-conspirator, the linchpin of this case, there's no government case. Mr. Fang is not guilty, so to speak, of all those alleged misviewings. Let me ask you, is there any other explanation how Guo, a factory manager, comes up with millions of dollars? They're business people. I'm not sure how they might have acquired it. I think the answer to that question is no, in the end. I mean, I spend a lot of time going through these things. He is a factory manager. He's dealing in millions of dollars and sending millions of dollars to Fang. Where the heck does Fang think that money comes from? I don't know that. It's the allegations to a respectable amount. But isn't that the problem? Because here we're not talking about a criminal conviction, proof beyond a reasonable doubt. Here we're talking about the exercise of discretion. And frankly, if I'm sitting in the IG's shoes, I might well say, gee, this whole thing stinks. Not all criminals in China are necessarily being politically persecuted. Some of them really are criminals. And I've got enough here to make me think, you know, if Fang isn't himself a criminal, at least he's sleeping with dogs and that's why he has fleas. And I'm not going to exercise discretion in his favor to adjust status. Why can't the IJ do that? I think that's not the authority of the IJ. If we look at the immigration nationality, And we're giving them a pretty good break on this convention against torture. Well, Your Honor, You know, what's wrong with that? Well, there's a final order of removal that Mr. Fang has hanging over him. He can be removed to any other country, so it's not the protection of the science. But right now, he's safe. He's safe, right? Well, that's correct, but he can't have full status that he would if the judge did not ignore. Oh, yeah, it's a better deal. It's a better deal than being deported, yes, sir. It's a better deal than the other. Well, of course, yes, sir. And I don't know how many people who get the benefit of the convention against torture are subsequently, you know, removed or kicked out of the country. I haven't seen any of those cases. So he got a good... In other words, the attorney general says, Well, you know, there's something fishy here. The Chinese government feels like it's been taken. And, yeah, we've got the testimony of this other co-conspirator. And we haven't gotten anything from Mr. Fang that's going to help us much. And, well, I'll exercise my discretion, and I'll grant protection under the convention against torture. So what's wrong with that? I mean, that's what he does. Well, but, Your Honor, I think, in reference to what Justice Beale was inquiring to government counsel was, Can you do that? And if I could cite to the court section from the Immigration Nationality Act... Can you do what? Cite to the citation 212A3C of the Act and also 237A4C of the Act. Those sections of the Immigration Act confers authority on the Secretary of State to certify that an alien present in the U.S. would have severe adverse foreign policy considerations. So if the Chinese Communist government thinks that Mr. Fang is such a bad dude, they ought to talk to diplomatic level and have the Secretary of State certify that Mr. Fang is an adverse public... severe adverse foreign policy consequences, and deport him on that basis, a legitimate basis that's on the books rather than... I don't understand anything that you're talking about now. No, Your Honor. So go over it again. Right. Judge Beale asked about, and I think Judge Ferguson's question about, well, can't the judge exercise discretion and think I've got suspicions? I said, no, you just can't go on suspicion. Well, he's not exercising discretion to remove him. He's exercising discretion to deny adjustment of status. Precisely. In Part 2, testimony says, hey, you can't believe anything that those Communist agents said in Part 1. And if they judge, if the Attorney General feels so strongly that Mr. Fang should be removed, 212A3C allows... If your factual premise is what you just said, that is that the IJ found you can't believe anything the Chinese Communist agents said, we went through that exhaustively a few minutes ago, and he didn't find, or she didn't find that. Absolutely. So don't give me that premise. Okay. Tell me what in the statute limits the exercise of discretion in denying adjustment of status. I think due process... Well, you just told me that the regulations limit the exercise of discretion in denying adjustment of status. And then you start talking about Secretary of State. That's where I got lost. Okay. Just make the connection. Let me pick that up. The regulations require the immigration judges to make decisions on the record. And I know we may have a disagreement about Part 2 and Part 1. Putting that aside. Not on the record. Disagreement about the findings. Well, that's my interpretation. Right. The Secretary of State's function is to take care of this precise situation where there might be some suspicions. And we don't have evidence on either side, perhaps. The record is not clear. The BIA thought the record was not clear as to what the immigration judge would have done. So what you're saying is that on this record it doesn't appear that the Chinese government is bothered about anything or upset about it enough to go to the Secretary of State. Is that what you're saying? Well, I don't know why they haven't gone to the Secretary of State. I mean, that's what you're saying. Not exactly, Your Honor. I'm saying there's a law on the bus that people have overlooked, that the highest level of our government, at the Secretary of State, non-delegable authority. This has to come from the Federal Department. We're talking about a law that's overlooked. And you haven't answered Judge Clifton's questions, which I would also like to hear. If Fang was dealing with Guo, a factory manager, and getting hundreds of millions of dollars, or dozens of millions of dollars, where did Fang think it was coming from? I don't think the record is clear on that. But let me also point out that the translation of Mr. Guo's title as factory manager may or may not be accurate in terms of how we perceive managers in our country as not being, say, the CEO or the chairman of the board. It could very well be a much higher authority, and people just use titles in a different way over there, Your Honors. But where do you think he was getting the money from? From the company he was managing? It could be. Or independent wealth? I don't know. The record's not clear, and I think the government has established that Mr. Fang knew where the funds were. And also, Mr. Guo, when he testified, had not looked at his deposition from prior years, even though I believe the record reflects that the immigration judge had wanted the government lawyers to make sure that Mr. Guo knew where he was testifying to. He did. I'm trying to remember. The minute is up. Thank you, Your Honors. Thank you very much.
judges: Pregerson, Clifton, Bea